Benjamin F. Shaw Co. *v.* Musgrave.

(*Knoxville,* September Term, 1948.)

(May Session, 1949.)

Opinion filed July 2, 1949.

(1)

C. G. MILLIGAN, of Chattanooga, for plaintiff in error.

WOOD & WOOD, of Chattanooga, for defendant in error.

MR. JUSTICE BURNETT delivered the opinion of the Court.

This is an action for benefits under the Workmen's Compensation Law. Code, Section 6851 et seq. The trial judge found in favor of the petitioning workman and fixed his disability as total, allowing him the full recovery under the Act.

The plaintiff in error in his brief and assignments of error states the question before us as follows:

"Petitioner, a steam fitter employed by defendant, was disabled by a heart ailment known as pericarditis with

effusion. There is no dispute about the employment, nor the wage of the petitioner, and the case hinges on the question of whether or not the disease resulted from an injury by accident arising out of and in the course of his employment.''

The petitioner operated a band saw, sawing some galvanized iron gratings. He says that in operating this saw it was necessary for him to rig up some kind of a contraption with a two by four which was placed against the saw and on this two by four he rested his chest and kept his weight or pressure against the two by four to force the saw through these gratings. He says also that these gratings were spaced about an inch apart, and ''when each bar was sawed, the release of the pressure of the saw would cause the grating to move forward suddenly and then stop suddenly—giving the body of your petitioner a sharp blow over the heart area of the chest; these blows culminated on the first day of May, 1948 with a blow causing your petitioner to have an injury in this area of the chest, muscle, fascia and bones, and particularly to the heart, causing pericarditis, with effusions, which causes permanent disability''.

It is testified that in the course of this process the petitioner experienced approximately seven thousand, nine hundred and eighty jars to his chest and that as a result of these jars his chest became sore and he suffered intensely therefrom. He says that as a result of this he went to the company doctor and the company doctor diagnosed his condition as a chest strain. He was apparently suffering intensely and not able to get relief from the heat treatments which the company doctor prescribed for him and he, therefore, went to a hospital in Chattanooga. The heart specialist at the hospital

diagnosed his condition as pericarditis with effusion. All other doctors agreed at that time that this was his trouble. This condition, pericarditis with effusion, is a disease due to an infection. This disease is described by the doctors testifying herein as an inflammation of the membranous sac surrounding the heart, and they say that effusion means that the pericardial sac has filled with a liquid and contains pus blood or something of the kind and that it causes total and permanent disability. It is said by all the doctors that this trouble may be remedied by an operation which is rather dangerous. One doctor says that when such an operation is performed that it is fatal in about 60 per cent of the cases.

This disease is always due to an infection. It sometimes starts with an open infection, sometimes due to trauma, or some disease condition of the heart. "The infection starts, the germs are carried around in the blood stream and an infection starts in the pericardium, —the heart muscles itself." "If you have it caused by disease, you don't necessarily have to have any trauma, but if you have trauma where there is some bruising or contusing of the heart, or heart muscles, then the infection in the blood stream starts growing."

Another doctor says that the infection may be caused by "streptococcus, tuberculosis and trauma,—trauma is not an infection,—trauma is merely the bruising of the tissue that can be a seat of infection. For instance, you can bruise your leg and get an infection,—you can bruise a bone and get osteomyelitis, because dead tissue is present and circulation is interfered with and infection sets in, but trauma is not infection, that is what I mean."

This same doctor testifies that: "The constant blows on the chest could bruise the chest wall and extend to

the pleura, and pass on into the pericardium, but infection would have to be a secondary thing in a bruise. Now, the question is, whether he was bruised enough to injure tissues that infection would settle there, would be very, very difficult to say. Peculiar occurrences do happen and it is barely possible that it could.''

This doctor again says: ''Now, if it is conceivable that the bruise of the chest laid the field open for an infection that would not have been there unless he had the bruise, and then as this formulated and got into the blood stream and lodged in the chest, then you could say it was the same cause as a bruise on the thigh might cause a brain abscess, yet the brain was never hit, neither was the chest. I am not saying that the brain or chest caused the infection. I am saying that is a possible injury.''

This doctor is asked on cross-examination:

''X 15 Now, Doctor, in view of the history which Mr. Musgrave gave you, of a sore throat, with sore glands in his neck, and cold that had existed over a period of three weeks before you saw him, I will ask you if the condition which caused pericarditis was not probably due from the sore throat, involved glands, etc.? A. That is a question I have turned over in my mind ever since I have been on this case. Usually a cold will clear up in a week or two weeks,—is gone. It is conceivable the organisms are still present,—just laying there for a suitable place to grow. Now, whether he would have overcome the whole thing if he had not had the injury to the chest, that nobody can say. I don't know. Certainly the organism has to come from some where, and it does not perforate through the skin,—there was no cut,—there was no laceration,—it had to come

through the blood stream. Whether it came from the throat or whether it came from elsewhere we don't know. We do know organisms are always present in the throat, and that they are always open to attack; that is the reason a bruise on the leg or a broken bone are so dangerous,—that is the reason we give streptomycin frequently following an injury. I swear I don't know whether it—it is possible yet I can't say. We all have organisms there, and whether this particular organism was from the cold we don't know. We didn't culture it. He evidently felt well enough to go back to work,—was working.''

Again the doctor was asked:

''X 30   Doctor, I will ask you if it is not more probable that this man's condition,—that is, the pericarditis, was the result of an infection than it was the result of trauma?   A.   You are dividing the pericarditis into cause and factor, and the question does not mean anything. I think everybody will admit Mr. Musgrave has an infected pericardium,—an acute pericarditis, which was infectious,—they are always infectious. Two, we will have to admit it didn't go directly through the skin,—it would have to be through the blood stream,—the source of infection being unknown,—whether it came from the throat or a pimple on the body, or infected direct, or where. Three, the history of the case states that he had a bruise—or rather that he was hit—don't say bruise,— in other words, there was no obvious bruise,—that he was hit on the chest with a machine repeatedly; and, fourth, it was in that area that infection took place. Now, the question is, whether there was enough bruising done to the chest wall, or pleura and pericardium to be a suitable field for infectious germs, that are going through the blood stream, to settle there, *to me is the*

*basis of the whole thing,* and nobody knows, as those bacteria have no tags on them as to where they come from." (Emphasis supplied).

And again this Doctor says: "The only possibility the blow had caused the adhesive pericarditis was with sufficient injury to the tissues of the chest wall, and the pleura and pericardium, to make a suitable field for infection to set in and produce the disease. Now, that is as clear as I can put it. Whether that did or didn't, that is for the Court to decide."

We have quoted rather extensively from the medical testimony in this record. The obvious reasons for quoting at such length will be seen to be that the whole case turns on whether or not under this evidence (in view of the fact that the man was apparently a healthy and normal man prior to doing this work) this was sufficient for the trial judge to base his conclusion.

In addition to the very able arguments which we have heard herein and the excellent briefs filed by both parties, we have made a rather extended independent investigation of the authorities and the questions herein raised.

It is very ably and forcefully argued that the injury complained of by the injured workman herein is not an accident within the terms of the Act. This Court has frequently had before it the question of what is an accident within the terms of the Act. The question has been very ably discussed in *King* v. *Buckeye Cotton Oil Co.,* 155 Tenn. 491, 296 S. W. 3, 53 A.L.R. 1086, and in *Sears-Roebuck & Co.* v. *Starnes,* 160 Tenn. 504, 26 S. W. 2d 128, 130. It is not necessary for us, and would be futile, to attempt to discuss the question further than has been discussed in the two cases referred to. Suffice it to say that we have never laid down any exclusive

definition of the term. This Court has been content always to say that the word accident is " 'usually applied' to an event or happening in the nature of a misfortune, casual or fortuitous" *Sears-Roebuck* v. *Starnes, supra,* It is not necessary that the happening of the accident be a single occurrence identified in space of time. It may be, as in *Sears-Roebuck* v. *Starnes, supra,* that constant pecking away at a typewriter caused an expected thing and yet from that expected thing a disease sets in. This setting in of this disease is classified as an unexpected thing or a misfortune, it is an unexpected casualty. We need go no further in this discussion than to paraphrase some of the language in *Sears-Roebuck Co.* v. *Starnes, supra.* In the instant case the injured workman might have expected the jars on his chest to cause a soreness there and possibly a slight bruise, but the "appearance of an infection therefrom was something fortuitous, not to be expected, an unusual event or result, and therefore accidental."

In view of the holdings of this Court, particularly in the two cases heretofore cited, the only question left for our decision is: whether there was evidence to support the finding of the trial judge that the injured employee received the injuries complained of, or the disease complained, in consequence of the injuries he had received in the course of his employment, that is, from bruises by reason of the blows or jars when pressing on this machine, or whether or not this diseased condition of the heart was due to his sore throat or from other causes.

To phrase the question in another way, we might say that the question is, in view of the nature of the complaint of the injured employee, is the evidence of these

injuries received in the course of his employment enough when connected with the testimony of the doctors that they might be the cause of the thing that he is now suffering with sufficient or should there be some expert or medical testimony that the disease with which he is now suffering is directly connected with this injury? Should there be a positive assertion of the expert that the disease or injury from which he is now suffering is connected with the bruises that he received from these jars?

Some of the courts hold, in order to fix liability on the employer, that it is necessary that the expert opinion state a conclusion that the defendant's acts were the cause of the injury complained of. They say "If the expert could not say that in his opinion the acts complained of did or did not cause the injury, then his testimony was without value, being mere speculation and conjecture, and affording no basis for an award of damages." *Jackson* v. *Harries,* 65 Utah 282, 236 P. 234, 237.

This view is followed by the Illinois courts, the New York courts, the Pennsylvania courts and others.

Apparently though the overwhelming weight of authority is to the contrary. The majority of the cases holding that the expert may testify that the Acts assumed could be or might be the cause of the condition described and leaving it to the trial court to say whether or not they were in fact the cause thereof. See Annotation L. R. A. 1915A, page 1070. Also Jones Commentaries on Evidence, 2 Ed. Vol. 3, Section 1347 page 2465.

The Supreme Court of Okla., in *Magnolia Petroleum Co.* v. *Snapp,* 149 Okla. 51, 299 P., 137, 138, said:

"Evidence that an employee's sight in one eye began to fail shortly after an injury to the other eye, and that the condition might have resulted from the injury, is

sufficient to support a finding by the State Industrial Commission that the injury did result therefrom.''

The rule we have expressed last above is a rule as to the admission of the evidence by the expert when asked a hypothetical question and not a rule as to its weight. We think the majority rule above referred to is the sounder of the two rules and is the rule we follow in this State. See *Lee* v. *Aluminum Co.*, 184 Tenn. 287, 198 S. W. 2d 639; *Sanders* v. *Blue Ridge Glass Corp.*, 161 Tenn. 535, 33 S. W. 2d 84. When it comes to the weight to be given this evidence that is a question for the trial court—trier of facts—to consider this evidence along with other evidence in determining whether or not the injury is a connecting cause to and with the ultimate disability.

The test to be applied here is well set out in *King* v. *Buckeye Cotton Oil Co.*, *supra*, wherein the court quotes at length from *Bramble* v. *Shields*, 146 Md. 494, 127 A. 44, 48. In paraphrasing and quoting from what the court there says, the rule to be here followed might be thus stated: The trial court must find that ''there is a causal connection between the accident and the'' pericarditis with effusion with which Musgrave was suffering; or that the pericarditis with effusion with which Musgrave is suffering ''is, with reasonable certainty, directly attributable to the accident.'' Or as later said in that opinion:

''It can make no difference whether the results are usual or unusual, if there is a direct causal connection between the injury and the disease, so that the disease is directly attributable to the injury.''

Does the factual situation presented by this record show such a state of facts that would warrant the trial judge in concluding as he did? The trial judge said:

"He was apparently in good health until he felt his first chest pains and went to Dr. Fitts who found him suffering from chest strain. It is natural to believe that the constant jarring on his chest had inflamed the pericardium. According to all the medical testimony, roving germs could have come from the blood stream, settled there and set up an infection. This is the only logical conclusion I am able to reach from the whole proof."

Dr. Binger, the heart specialist, testifies (quoted above).

"Now, the question is, whether there was enough bruising done to the chest wall, or pleura and pericardium to be a suitable field for infectious germs, that are going through the blood stream, to settle there, to me is the basis of the whole thing, and nobody knows, as those bacteria have no tags on them as to where they come from."

This statement of the doctor would clearly lead one to believe that it was his judgment that the more likely cause of the infection did come from the bruises of the chest. Of course he could not absolutely say where these things started. The employer offers the testimony of a doctor who in answer to certain questions says that in his opinion the trouble Musgrave was suffering with (pericarditis with effusion) could not have started in the bruised chest; that from the pictures of the machine and the work done this could not have caused a bruised chest wherein this germ could have started; that the sore throat was the most likely starting point and cause.

It seems to us that in a disputed question of fact under testimony of this kind, highly technical, that the trier

of facts should be left free to adopt that view which is most consistent with reason and justice.

█ We have often said, as was again so well said by MR. JUSTICE GAILOR in *Anderson* v. *Volz Const. Co.*, 183 Tenn. 169, 173, 191 S. W. 2d 436, 438:

"On appeal under the Workmen's Compensation Act, we do not reweigh the evidence, but search the record only so far as is necessary to determine that there is material evidence to support the finding of the trial judge. *Tennessee Products Corporation* v. *Gravitt*, 182 Tenn. 54, 184 S. W. 2d 164; *Tipton* v. *North American Rayon Corp*, 181 Tenn. 434, 181 S. W. 2d 619. The weight of evidence anl the credibility of the witnesses are finally determined in the trial court."

█ After giving this matter an unusual amount of study and thought and very carefully considering this record, the authorities cited in the excellent briefs and our independent investigation thereof, we are forced to the conclusion that there is competent material evidence to support the finding of the trial judge. This finding is in substance, that there is a "direct causal connection between the injury and the disease" and that "the disease is directly attributable to the injury".

For the reasons above assigned, the judgment below must be affirmed.

All concur.