403 A.2d 1387.

SAMUEL BROWN *vs.* HOPE SERVICE STATION, INC., *et al.*

JULY 27, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   This is a workers' compensation proceeding. The worker is Samuel Brown (Brown). His employer, the Hope Service Station, Inc. is the nominal owner and operator of a gasoline service station situated in Scituate. Sometime in May 1973, Brown was busily engaged in renovating the exterior portion of the station's premises. Part

of the remodeling program called for the erection of a retaining wall made up of railroad ties. As Brown commenced the retaining-wall project, he picked up one of the ties and experienced some back pain. In the years that followed, Brown continued to perform his service-station chores despite his aching back. Occasionally, he would seek the assistance of either a chiropractor or an accupuncturist.

In June 1976, the intensity of the ache had increased to such a degree that Brown decided to consult a neurosurgeon. Tests indicated the presence of a large protruding disc. Surgery confirmed the disc's presence. Once the disc was removed, Brown began to look for compensation. As he did, he became confronted with the question of which insurance carrier should pay—the carrier who provided the coverage on the day he picked up the tie or the carrier providing the coverage at the time Brown stopped working and sought out the neurosurgical skills of Dr. Julius Stoll, Jr.

Fireman's Fund Insurance Company (Fireman's) was the insurer on the day Brown picked up the railroad tie, while American Universal Insurance Company (American) was supplying the coverage in 1976 when Brown stopped work. Neither insurer questions Brown's right to receive benefits, but each points to the other as the one obligated to provide the monetary benefits set forth in the Workers' Compensation Act.

The trial commissioner ruled that American was the one obligated to pay, and the full commission affirmed his findings. On American's appeal we affirm the commission's finding regarding insurer responsibility because compensation is awarded, not on the basis of physical injuries sustained, but on the basis of the resulting impairment in earning capacity. *Parkinson* v. *Leesona Corp.*, 115 R.I. 120, 125, 341 A.2d 33, 36 (1975); *Microfin Corp.* v. *DeLisi*, 111 R.I. 703, 708, 306 A.2d 797, 800 (1973); *Geigy Chemical Corp.* v. *Zuckerman*, 106 R.I. 534, 539-40, 261 A.2d 844, 848 (1970). Since the crucial date is the time of incapacity rather than of injury, when an employer purchases workers' compensation

coverage, the insurer assumes the employer's responsibility to compensate the worker for his or her loss of earning capacity. The insurable incident which invokes coverage is the diminution in earning capacity rather than the injury itself which caused that reduction.

This court on other occasions has adopted the date of incapacity rather than the date of the injury as the focal point when determining such matters as the amount of compensation to be paid,[1] the length of the period during which payments are to be made,[2] and the amount of the worker's average weekly wage.[3] Apart from our past actions, simple justice would dictate that the crucial factor in this controversy would be the date of incapacity rather than the time of injury.

Prior to September 1, 1974, a worker who had suffered a total loss of earning capacity could, because of the provisions of G.L. 1956 (1968 Reenactment) §28-33-17, receive a weekly benefit that equaled two-thirds of the average weekly wage the employee was receiving at the time of the loss. Subsequent to August 31, 1975, such an individual's weekly benefits would equal the average weekly wage being paid to individuals whose employers were subject to the provisions of the Employment Security Act. In 1973 Fireman's was charging Brown's employer a premium equal to $1.99 per $100 of annual employee remuneration. Later, in 1976, American's premium amounted to $3.50 of every $100 paid the employees. Obviously, the increase in rates reflected, at least in part, the additional benefits conferred upon the employees. To hold Fireman's liable for Brown's 1976 benefits simply does not make sense or comport with any notions of fair play.

---

[1]*Parkinson* v. *Leesona Corp.*, 115 R.I. 120, 341 A.2d 33 (1975).

[2]*Ludovici* v. *American Screw Co.*, 99 R.I. 747, 210 A.2d 648 (1965).

[3]*Fontaine* v. *Gorfine*, 105 R.I. 174, 250 A.2d 361 (1969).

Admittedly, 22 years ago this court, when confronted with a somewhat similar situation in *Santilli* v. *Original Bradford Soap Works, Inc.*, 85 R.I. 305, 131 A.2d 235 (1957), ruled that the carrier on the date of the 1942 injury was liable even though the incapacity did not manifest itself until some 11 years later in 1953 when another carrier was furnishing coverage. The *Santilli* court gave no reason for the choice it made. In fact, the court did point out that Santilli never had a cause of action as a result of his knee injury "until it incapacitated him in October of 1953." *Id.* at 313, 131 A.2d at 239. The absence of any rationale for the court's choice and the previous observations we have made in this case cause us to rule that, insofar as *Santilli* is inconsistent with today's holding, it is hereby overruled.

Having affirmed the commission's finding of American's liability, we now turn to Brown's appeal in which he claims that the commission erred in denying him partial disability benefits following his return to work in late November 1976. Like many others[4] who have been injured while working for a family-owned corporation, when Brown returned to work, he was paid the same weekly salary ($300) he had received prior to his October hospitalization.

In *Kilsey* v. *Chuck Wagon, Inc.*, 119 R.I. 443, 445, 379 A.2d 919, 920 (1977), this court stated that

> "the receipt of post-injury weekly payments equal to pre-injury weekly wages creates a presumption that an employee, although disabled, has not sustained the requisite impairment of earning capacity upon which entitlement to weekly compensation benefits depend. *Peloso, Inc.* v. *Peloso*, 103 R.I. 294, 298, 237 A.2d 320, 323 (1968). That presumption is rebutted, however, if an employee demonstrates that the weekly payments received during disability are an unreliable basis for estimating earning capacity."

---

[4] *Kilsey* v. *Chuck Wagon, Inc.*, 119 R.I. 443, 379 A.2d 919 (1977); *Peloso, Inc.* v. *Peloso*, 103 R.I. 294, 237 A.2d 320 (1968).

We indicated that the presumption could be rebutted by evidence that the payments received by an employee are intended as a gesture of gratitude by a grateful employer for past services rendered, *Trzoniec v. General Controls Co.*, 100 R.I. 448, 451, 216 A.2d 886, 888 (1966), or if the remuneration represents accumulated sick leave and vacation pay, *Robidoux v. Uniroyal, Inc.*, 116 R.I. 594, 597-98, 359 A.2d 45, 47-48 (1976). In *Kilsey*, we held that the presumption could also be rebutted if the employee established that he or she was so disabled as to be incapable of engaging in any gainful employment. 119 R.I. at 446, 379 A.2d at 921.

Brown argues that his postoperative inability to perform work requiring a high degree of physical exertion necessitated the employment of an additional auto mechanic. He contends that the new mechanic's $175 weekly wage effectively reduced the value of his own $300 salary. We cannot agree with Brown's contention. The moneys paid the new employee came not from Brown, but from the station's corporate coffers. Here, the essential issue was and is whether Brown in fact earned his $300 weekly salary. 2 Larson, *Workmen's Compensation Law* §57.42 at 10-94 (1976). When Brown, the station's guiding genius,[5] returned to work, he was able to pump gas and keep books. He had conceded that the 1976 gasoline sales were substantially more than the station's 1973 volume. Brown, of course, had the burden of convincing the commisison that the gas-dispensing and accounting efforts he expended in behalf of his employer were not really worth the $300 wage he was receiving. Unfortunately for Brown, the commission placed more faith in the payroll records than it did in Brown's protestations that the weekly sum he received and called "wages" was not really wages.

Evidence concerning "wages"received by an employee on his return to work is relevant on the issue of the extent of the

---

[5]Brown is the station's senior employee. By virtue of his rank, he is the only one who is not required to punch a time clock.

employee's earning capacity and is entitled to such weight as the commission might choose to give it. Factfinding is the sole prerogative of the commission because by statute this court cannot weigh evidence in workers' compensation cases. Here, Brown had the burden of presenting credible evidence indicating that he remained partially incapacitated. The evidence he presented was subject to evaluation by the factfinders. The commission obviously believed that Brown's performance at the pumps and his mathematical expertise were worth every penny of the weekly $300 he was being paid. Since there is competent evidence to support the commission's conclusion, we will not and cannot disturb it.

The employee's and American's appeals are denied and dismissed, all the decrees appealed from are affirmed, and the causes are remanded to the Workers' Compensation Commission.

*Bernard W. Boyer*, for petitioner.

*John A. Baglini, Harold E. Adams, Jr.*, for respondent.