**McKEEVER CUSTOM CABINETS and Lumberman's Mutual Casualty Company, Appellants,**

v.

**Keith Allen SMITH and Hartford Insurance Group, Appellees.**

No. 84–1317.

Supreme Court of Iowa.

Dec. 18, 1985.

John M. Peters of Peters Law Firm, P.C., Council Bluffs, for appellants.

Sheldon M. Gallner and Susan M. Conroy of Gallner & Gallner, P.C., Council Bluffs, for appellee Smith.

James E. Thorn, John M. French, and Kevin D. Van Dyke of Stuart, Tinley, Peters, Thorn, Smits & Sens, Council Bluffs, for appellee Hartford.

Considered by UHLENHOPP, P.J., and HARRIS, LARSON, CARTER, and WOLLE, JJ.

UHLENHOPP, Justice.

The principal question in this appeal is whether a workers' compensation claim by employee Keith Allen Smith is barred by time limitations.

Smith worked as a cabinet maker and installer for employer McKeever Custom Cabinets from April 1978 to August 1980 and from March to May 1981. The work involved considerable hammering as well as vibrations from pneumatic and electrical tools such as sanders. Between Smith's two periods of employment by McKeever, Smith worked on a farm in Minnesota and for a cabinet maker in Oklahoma.

In November 1978 a falling sheet of wood in McKeever's shop struck Smith on the right wrist. Smith lost no time from work as a result of this incident. He obtained an X-ray of the wrist, which was negative. In April 1979, while helping to carry a cabinet, Smith fell into a six-foot hole and struck his right arm. This time he lost about a half-day's work, but he did not have an examination. He made no workers' compensation claims on these occasions.

Smith continued with his duties for McKeever, but from about the time of these two incidents he experienced some

discomfort in his right wrist upon continued use of it at work. He did not obtain further medical attention or take time off, but performed his duties believing the discomfort to be a normal result of the pounding and vibrating which his job entailed. As months went on, however, the wrist pain grew worse, and he was obliged to favor his right wrist by the use of his left hand in such tasks as extended use of a vibrating sander.

Ultimately the wrist pain grew to the point that Smith concluded he should have his wrist examined. His father had undergone recent surgery by an orthopedic surgeon who was reputed to be outstanding, and Smith obtained an examination by that expert in April 1981. The surgeon diagnosed aseptic necrosis of the lunate bone—the death of the large bone in the wrist from lack of blood supply. This condition is irreversible, and fusion of the wrist is the only treatment. The treatment ends the pain (from a kind of arthritis) but also ends the wrist movement.

As of about May 1, 1981, Smith notified McKeever about the wrist condition and quit his job on account of it. On May 11, 1981, McKeever filed a first report of injury with the Iowa Industrial Commissioner, setting forth the details. On August 27, 1981, Smith instituted the present workers' compensation claim. He subsequently underwent surgery for fusion of the wrist.

Substantial evidence in the case, introduced before the deputy commissioner and then brought before the commissioner on review, established the facts we have recited. The pivotal question related to the cause of the aseptic necrosis. Was the cause of the wrist trouble the 1978 and 1979 incidents, or the continual hammering and vibrating involved in the job, or a combination of those factors? The following excerpts give the gist of the testimony of Smith's surgeon:

Q. Doctor, what is the difference between aseptic necrosis and osteonecrosis? A. The difference between aseptic necrosis and osteonecrosis, aseptic necrosis follows interruption of blood supply to the bony area, through various means or methods.

Q. And osteonecrosis? A. Osteonecrosis is a long-term degenerative change, based on normal wear and tear.

Q. So your diagnosis of aseptic necrosis would be consistent with a traumatic event, as opposed to a degenerative change in the bone; is that correct? A. Right. Moreover, a traumatic event or a series of such.

. . .

Q. And in Mr. Smith's case, do you have an opinion, Doctor, as to the cause of the necrosis of the lunate bone? A. I do. I feel very strongly that his wrist, lunate necrosis and ultimate surgery directly related to his occupation and the type of work he does. This is the characteristic type pattern we see in this type of condition.

Q. Okay. I'm a little unclear, Doctor. Are you referring to something then other than the single event that Mr. Smith related to you in his history as having occurred in November of '78? A. Okay. Wrist—lunate necrosis can come from a single event and we frequently do see it come from a single event. But again it is most common in people that use their wrists for hammering and pounding, carpenters, shinglers, people who shingle roofs, this sort of conditions.

Q. And from—and is this opinion, Doctor, based on the history that Mr. Smith gave you of the nature of his work? A. It's based upon that, yes, and the fact that almost all of these that we see are such related, yes.

Q. And Mr. Smith, I gather from your testimony, related to you that he was involved heavily in hammering; is that correct? A. Yes, heavy use.

Q. And I gather then you are basing your conclusions upon the nature of hammering and how you know that to affect the lunate; is that correct? A. Yes. It affects the lunate by constant trauma or it could be an acute episode to the wrist area causes the blood vessels to clot that supply the lunate bone.

Q. Such activities as operating a pneumatic air tool would not affect—A. It could very well get lunate necrosis—

Q. It could? And how does that result? A. It's a strong repeated trauma to the wrist area.

Q. Other than the hammering, what else did Mr. Smith tell you—describe to you as activity that caused aggravation or pain to his wrist? A. He said he had to do some lifting. I think he did sawing and he did use his hand and wrist frequently in work for pounding and this, of course, is a classic type of history we see in people with this condition.

Q. We come back to pounding, as in hammering; is that correct? -A. Yes.

. . .

Q. Doctor, I would ask you to assume that prior to 1978, and early 1979, that Mr. Smith had a total absence of pain in his right wrist and that during the period, in late '78, '79, he suffered a single traumatic event to his right wrist, either by being struck by an external force or incidental to a fall, and that thereafter, immediately thereafter and continually and frequently thereafter, he experienced pain in that wrist, especially when actively using his right hand at work, up until the time he was first seen by you; would this change your opinion as to the cause of the necrosis? A. Change it from what?

Q. Being a result of his occupation to being as a result of a single traumatic event? A. I think what we've got to establish here is the fact, this condition obviously can come about from a single traumatic incident, such as falling or a hard blow to the wrist where it creates swelling within the joint, certainly this can happen also. And the other condition it can come from is repetitive hammering and use of the wrist and hand to do manual labor. Now, his history, of course, is that he, in November of '78 did have some traumatic incidents to his wrist and, of course, he continued to work, while hammering. And it could come from either one, most likely, or historically speaking, it was set off by the fact that he did have acute trauma to the wrist. In his history.

Q. Is it your opinion, then, Doctor, that the acute trauma in November of '78 was the cause of the necrosis? A. I would say that probably, historically speaking, even since he began having it at that time, it was most likely.

Q. And from what you've testified, Doctor, I understand it to be that once the interruption of the blood supply occurs, that it is irreversible? A. It's irreversible.

Q. So that then any continuing work activity would be irrelevant as far as the inevitable course of the injury and the condition; isn't that correct? A. It would just speed up the course of it. The ultimate result is going to occur no matter what, over a period of time. If he was working with it while it's injured to any degree, he's just going to make the end result come about quicker.

Following is the substance of Smith's testimony:

Q. So it was after this incident when the board came out and hit your wrist that the pain started? A. Well, see, it's—that was hard for me to distinguish because we use sanders and hand tools a lot and a lot of times you would experience strain. It was just like if you hold something at an angle a lot or the drills or the sanders a lot, you'd get like a fatigue and a strain. So then I just assumed it was natural.

. . .

Q. Would you describe for us the manner in which the discomfort in your right wrist progressed from July [sic—April] of 1979 until you saw Dr. Bush in April of 1981? A. It would just—at first it was just, like I say, it would only occur if I used a hand tool for a long period of time.

Q. What is a long period of time? A. Two hours. A lot of time we'd be working on one certain project which would—I'd have to sand or something for that period of time. Then it would just start

to—I don't know what arthritis is like, but I just kind of compare it to that. Because it was just a discomfort and it was easy for me to take up with my left hand or just do another project until it wasn't bothering me. But as it progressed along, I would just notice it more often. It wasn't like if—in a certain period of time, cause it took a long time.

Q. And then as—starting from this point where you had the pain, discomfort, following use of a hand tool, for like two hours—A. Uh-uh.

Q. —did it—the condition become more sensitive? Did it take less and less to cause this discomfort? A. Yes. Over the next year period.

Q. And by the time you went to Dr. Bush in April of 1981, what was the condition of the wrist? A. It would just—I was conscious of it every day and so that it became continually harder to work with my right hand and so I was always constantly using my left and making up for it.

. . .

Q. Let me ask you this: The condition of your hand—and by hand I mean hand and wrist—as it was in August of 1980, could you compare that to how it was when you left in May of '81? You quit your employment with McKeever on two occasions. Once in August of '80? A. Uh-huh.

Q. And then again in May of '81. What was the condition of your wrist in terms of limitation, pain, disability on those two occasions? Was it about the same? A. Just a little worse. It was just that I finally realized that it wasn't going to improve.

After hearing, the deputy commissioner adopted a theory of "cumulative injury" and held for Smith. The commissioner and the district court affirmed on review. McKeever and its present insurance carrier, Lumberman's Mutual, appealed to this court. Unless otherwise stated we will refer to McKeever and Lumberman's together as McKeever.

In this appeal McKeever and Lumberman's advance several propositions: (1) the compensation claim is barred by sections 85.26 and 85.23 of the Iowa Code of 1981 (references are to that Code); (2) in any event Smith is not entitled to healing period benefits; (3) if compensation is allowed, it should be based on Smith's wage rate in 1978 or 1979; and (4) Hartford rather than Lumberman's is the obligated insurance carrier.

I. *Time limitations.* McKeever relies on two separate time limitations: two years for instituting a workers' compensation proceeding, and ninety days for notifying an employer of an injury.

Chapter 85 of the Code contains the workers' compensation statute. Section 85.26(1) provides in pertinent part:

No original proceeding for benefits under this chapter ... shall be maintained in any contested case unless such proceeding shall be commenced within two years from the date of the occurrence of the injury for which benefits are claimed. . . .

Section 85.23 provides:

Unless the employer or his representative shall have actual knowledge of the occurrence of an injury received within ninety days from the date of the occurrence of the injury, or unless the employee or someone on his behalf or a dependent or someone on his behalf shall give notice thereof to the employer within ninety days from the date of the occurrence of the injury, no compensation shall be allowed.

A. Section 85.26(1). McKeever relies on the words in section 85.26(1), "the date of the occurrence of the injury," and argues that this is November 1978 when the board struck Smith or, at the latest, April 1979 when Smith fell into the hole. Both of these dates are more than two years before August 27, 1981, when Smith commenced this proceeding.

Smith argues that the discovery rule and also the cumulative injury rule are applicable. These two rules are closely

related, but they are not the same. The discovery rule may apply where a compensable injury occurs at one time but the employee, acting as a reasonable person, does not recognize its "nature, seriousness and probable compensable character" until later. *Orr v. Lewis Central School District*, 298 N.W.2d 256, 257 (Iowa 1980). The cumulative injury rule, however, treated by Professor Larson under the heading "gradual injury", may apply when the disability develops over a period of time; then the compensable injury itself is held to occur at the later time. 1B A. Larson, Workmen's Compensation § 39.10 (1985) (hereafter cited as Larson). Smith's claim, if he has a valid claim, is in the latter class. His contention is that the original two non-disabling incidents were only the beginning of a series of hurts and that his compensable disability gradually came into being as he continued to pound with hammers and sand with vibrators over a period of time—an accumulation of traumas to the wrist. Nor is his claim founded on the development of a disease, but rather, on repeated impacts to his wrist by external forces. *Cf. Black v. Creston Auto Co.*, 225 Iowa 671, 678, 281 N.W. 189, 193 (1938) (inhaling gas over a period of time: "Without attempting to analyze into just what category the injuries the claimant herein sustained falls, it is sufficient to say that his injuries were as directly due to injury suffered by him in the course of his employment by the defendant as if he had fallen off a defective ladder or had in any way been given an unsafe place in which to work.").

We must address three subsidiary questions on this branch of the case: whether Iowa should adopt the cumulative injury rule, whether substantial evidence supports that rule in this case, and when an injury "occurs" under that rule for purposes of statutes of limitation.

As to the first subsidiary question, should the commissioner's adoption of the cumulative injury rule be upheld? This presents a legal question, and legal questions are open to examination by the courts on judicial review. Iowa Code § 17A.19(8)(e).

We note initially that some jurisdictions confine workers' compensation benefits to disabilities arising from "accidents", which somewhat narrows liability. Larson, §§ 39.10, 40.00. In Iowa, however, liability is broader; it is founded on "injuries" arising out of and in the course of employment. Iowa Code § 85.3(1); *Almquist v. Shenandoah Nurseries*, 218 Iowa 724, 728, 254 N.W. 35, 37 (1934). Irrespective of the nomenclature, however, a number of courts have found liability to exist for disability which gradually came about over a period of time. Among these decisions are *Service Pharmacy v. Cox*, 252 Ark. 313, 478 S.W.2d 749 (1972) (long hours standing on concrete floor); *Festa v. Teleflex, Inc.*, 382 So.2d 122 (Fla.App.), *pet. for rev. denied*, 388 So.2d 1119 (Fla.1980) (carpal trauma syndrome of wrists from repeated turning and twisting of plastic molding); *Aldrich v. Dole*, 43 Idaho 30, 249 P. 87 (1926) (successive impacts on knee by shift lever); *Quaker Oats Co. v. Industrial Comm'n*, 414 Ill. 326, 111 N.E.2d 351 (1953) (intermittent falling of cans from machine onto employee's foot); *American Maize Products Co. v. Nichiporchik*, 108 Ind.App. 502, 29 N.E.2d 801 (1940) (Dupuytren's contraction due to several years of jarring of hands by air hammer); *Harper v. Kast Metals Corp.*, 397 So.2d 529, 531 (La.App.), *cert. denied*, 401 So.2d 988 (La.1981) (arthritis in wrists from heavy lifting: "Under the prevailing trend of the jurisprudence it is not necessary that plaintiff prove his disability results from a sudden unexpected traumatic event. It is sufficient to show merely that the disability was caused by a work activity which can be gradual and progressive in nature."); *Foble v. Knefely*, 176 Md. 474, 6 A.2d 48 (1939) (repeated impacts to knee); *Manthe v. Employers Mutual Casualty Co.*, 239 Minn. 368, 58 N.W.2d 758 (1953) (jars from riding on defective car seat eventually resulting in back injury); *Jones v. St. Regis Paper Co.*, 196 Mont. 138, 639 P.2d 1140 (1981) (preexisting back condition becoming total breakdown from series of small injuries over period of a year); *Neilson v. Michael Stern & Co.*, 282

App.Div. 793, 122 N.Y.S.2d 472 (1953) (repeated bumping against steam iron); *Atlas Coal Corp. v. Scales,* 198 Okl. 658, 185 P.2d 177 (1947) (repeated bruising of knee); *Benjamin F. Shaw Co. v. Musgrave,* 189 Tenn. 1, 222 S.W.2d 22 (1949) (band saw continually impacting chest).

■ To promote the objects of the General Assembly reflected in the compensation statute, we construe that act liberally. *Orr v. Lewis Central School District,* 298 N.W.2d 256, 261 (Iowa 1980). Moreover, although we are not bound by the commissioner's construction of the act, we give deference to it. *McKee v. Second Injury Fund,* 378 N.W.2d 920, 921 (Iowa 1985). We uphold the commissioner's adoption of the cumulative injury rule for application in factually appropriate cases.

As to the second subsidiary question, the commissioner found as a fact that Smith came by his injury gradually, ultimately resulting in his disabled condition about May 1, 1981, when he terminated his employment. Agency fact findings which have substantial evidentiary support in the record as a whole are binding on us. Iowa Code § 17A.19(8)(f). The parties' dispute here is whether the commissioner's finding has such support.

■ The testimony of Smith's surgeon, standing alone, might not warrant a finding of cumulative injury. Expert testimony, however, may be buttressed by supportive lay testimony. *Bradshaw v. Iowa Methodist Hospital,* 251 Iowa 375, 380, 101 N.W.2d 167, 170 (1960) ("we have held such expert evidence as that given here is sufficient to warrant submitting to the jury the issue of proximate cause when coupled with other testimony, nonexpert in nature"). Taking the testimony of the surgeon and Smith together, under our statutory obligation to view the evidence as a whole, we conclude that substantial evidence supports the commissioner's finding of cumulative injury. The commissioner could reasonably find that Smith came by his disabled wrist from numerous incidents over a period of time including the first two incidents, and not simply from one or two events.

McKeever cites such cases as *Sondag v. Ferris Hardware,* 220 N.W.2d 903 (Iowa 1974). The commissioner's decision meets the requirements of those cases.

■ The third subsidiary question relates to the effect of the finding of cumulative injury upon the two-year statute of limitations: when did the "injury" occur for time-limitation purposes? Again we have a legal question.

Larson cites two rules which have been applied in the gradual injury cases: the injury occurs when pain prevents the employee from continuing to work, or when the pain occasions the need for medical attention. Larson, § 39.50, at 7–350.28.

■ We incline toward the former of these alternatives; clearly the employee is disabled and injured when, because of pain or physical inability, he can no longer work. *Ross v. Oxford Paper Co.,* 363 A.2d 712 (Me.1976) (claim began to run on March 17, 1974, when total numbness of hand ultimately set in, forcing employee to cease work); *Kacavisti v. Sprague Electric Co.,* 102 N.H. 266, 155 A.2d 183 (1959) (repeated trauma to thumb became accidental injury on day pain became so intolerable as to disable employee); *Ptak v. General Electric Co.,* 13 N.J.Super. 294, 80 A.2d 337, *aff'd,* 16 N.J.Super. 573, 85 A.2d 214 (1951) (date of gradually acquired sacroiliac strain was time pain made further work impossible); *Herndon v. Albuquerque Public Schools,* 92 N.M. 635, 593 P.2d 470 (N.M. App.1978) (date of accidental injury held to be when employee stopped work on account of back pain); *Trinity Concrete Products Co. v. Gabriel,* 475 P.2d 146 (Okl.1970) (accidental injury occurred when employee finally forced to quit because of difficulties with lungs from inhaling dust on the job); *St. Paul Insurance Co. v. Waller,* 524 S.W.2d 478 (Tenn.1975) (time ran from February 15, 1973, when employee finally quit or was discharged for inability to do the work).

■ Smith's wrist pain finally compelled him to give up his job about May 1, 1981. We hold that he had one compensable injury, that it occurred for time limitation purposes when Smith gave up his job, and that the two-year statute of limitations then began to run. He commenced this compensation proceeding in August 1981, within the limitation period. The proceeding is not barred by section 85.26(1).

■ B. Section 85.23. The two-year period under section 85.26(1) of the Code and the ninety-day period for notice under section 85.23 both run from the "the occurrence of the injury." *See Orr v. Lewis Central School District*, 298 N.W.2d 256, 259 (Iowa 1980). The injury occurred about May 1, 1981. By May 11, 1981, within 90 days, Smith had reported the details to McKeever, and McKeever had incorporated them in its report of injury to the commissioner. The case falls within the proviso in section 85.23: "Unless the employer or his representative shall have actual knowledge of the occurrence of an injury received within ninety days from the date of the occurrence of the injury...." The proceeding is not barred by section 85.23.

The remaining propositions advanced by Smith and Lumberman's are largely controlled by our upholding the commissioner's finding of cumulative injury.

II. *Healing period benefits.* On March 2, 1982, Smith entered a hospital to have his wrist fused, and on June 3, 1982, his surgeon discharged him from care. Smith delayed the surgery until March 2 for reasons of his own.

Section 85.34(1) of the Code provides in material part:

If an employee has suffered a personal injury causing permanent partial disability for which compensation is payable ... the employer shall pay to the employee compensation for a healing period ... beginning on the date of the injury, and until he has returned to work or competent medical evidence indicates that recuperation from said injury has been accomplished, whichever comes first.

■ McKeever asserts again that the injury occurred in 1978 or 1979, but that the commissioner did not start the healing period as of such time as the statute would require. We have held, however, that under the cumulative theory the injury occurred about May 1, 1981. The commissioner did not start the healing period then because Smith chose to delay surgery; the commissioner required Smith to minimize the damages. *Stufflebean v. City of Fort Dodge*, 233 Iowa 438, 9 N.W.2d 281 (1943). McKeever cannot complain that the commissioner delayed commencement of the healing period until Smith underwent surgery; that ruling operated in McKeever's favor. Under the statute and *Stufflebean*, the commissioner could commence the healing period with the surgery and extend it until Smith was medically discharged following the operation. At the latter time significant improvement from the injury was not anticipated. We do not find merit in McKeever's proposition.

III. *Applicable wage rate.* Between the time of the 1978 and 1979 incidents and Smith's terminating his employment in 1981, Smith's hourly wage increased from $4.25 to $6.50. Section 85.36 of the Code provides:

The basis of compensation shall be the weekly earnings of the injured employee at the time of the injury.

■ The commissioner used the figure $6.50 per hour in his computations, based on his finding of cumulative injury. McKeever contends that the commissioner should have used $4.25 based on occurrence of the injury in 1978 or 1979. As we have upheld the commissioner's application of the cumulative injury rule, we reject McKeever's proposition.

IV. *Obligated insurer.* Hartford Insurance Group was the workers' compensation insurance carrier for McKeever prior to February 5, 1980, and Lumberman's was its carrier on and after that date. The commissioner placed the liability on Lumberman's, but Lumberman's contends that Hartford instead should be entirely liable

based on occurrence of the injury in 1978 or 1979 or that Hartford should at least be liable for a proportion of the liability based on the respective periods of time the two insurers were on the risk as Smith's wrist worsened.

The issue of successive insurers confronts us with a problem of statutory construction. Our occupational disease statute places entire liability on the last employer in whose employment the employee was injuriously exposed, § 85A.10, but does not deal with employers' successive insurers. *See Doerfer Division of CCA v. Nicol,* 359 N.W.2d 428 (Iowa 1984). Neither does our Iowa workers' compensation statute in chapter 85 of the Code or our compensation liability insurance statute in chapter 87 contain an express provision fixing or apportioning liability between successive insurers. We are thus left to reason from the general provisions in chapters 85 and 87.

The significant provision in the compensation statute itself is section 85.3(1) which states in relevant part: "Every employer ... shall ... *pay* compensation according to the provisions of this chapter for any and all personal injuries...." (Emphasis added.) The significant provision in the insurance statute is section 87.1 which states so far as relevant: "Every employer subject to the provisions of this and [chapter] 85 ... shall insure *his* liability thereunder...." (Emphasis added.)

█ Applying the cumulative injury rule, we have held that Smith sustained his compensable injury when he left employment in May 1981, triggering McKeever's liability to *pay* workers' compensation as required by section 85.3(1). Lumberman's policy was then in effect requiring it to discharge *his*—McKeever's—liability. From these provisions we hold that Lumberman's has the liability.

As to the fairness of such a result, we stated regarding the corresponding liability of the employer in *Doerfer,* at 434–35: "Although the result sometimes may seem harsh on the employer charged with the liability under our interpretation of Iowa

Code section 85A.10, 'there will be a spreading of the risk when the total picture of [such] litigation is considered and this rule is applied on a nationwide basis....' "

We find support in the authorities for the view we take on successive insurers' liability. As stated in 4 Larson, § 95.00, at 17–108, § 95.20, at 17–112, –113, –115:

When disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation....

.    .    .    .    .

The "last injurious exposure" rule in successive-injury cases places full liability upon the carrier covering the risk at the time of the most recent injury that bears a causal relation to the disability. This rule—sometimes called the "Massachusetts-Michigan rule" because of its use in early cases in those states—is the majority rule in successive insurer cases, either by judicial adoption or by express statutory provisions. Although the statutory provisions for the use of the rule frequently refer only to occupational disease, the rule is often applied in accidental injury cases also....

*See Tri State Insurance Co. v. Employers Mutual Liability Insurance Co.,* 254 Ark. 944, 497 S.W.2d 39 (1973) (gradual injury from exposure of dust over sustained period, liability placed on insurer at time employee ceased work from disability); *Hartford Insurance Group v. Stewart,* 147 Ga. App. 733, 250 S.E.2d 184 (1978) (last insurer held liable); *In re Costa's Case,* 333 Mass. 286, 130 N.E.2d 589 (Mass.1955) (last insurer); *Utica Square Salon of Beauty v. Barron,* 595 P.2d 459 (Okl.App.1979) (same); *Brown v. Hope Service Station, Inc.,* 122 R.I. 74, 403 A.2d 1387 (1979) (same). *See also Carter v. Avondale Shipyards, Inc.,* 415 So.2d 174 (La.1982) (rejects apportionment in absence of statute); *Jensen v. Kronick's Floor Covering Service,* 309 Minn. 541, 245 N.W.2d 230 (1976)

(same); *Novak v. C.J. Grossenburg and Son,* 89 S.D. 308, 232 N.W.2d 463 (1975) (adopts Massachusetts-Michigan rule); *Duaine Brown Chevrolet Co. v. Industrial Comm'n,* 29 Utah 2d 478, 511 P.2d 743 (1973) (no apportionment). *Cf. Jackson Monument Co. v. Industrial Comm'n,* 220 Wis. 390, 265 N.W. 63 (1936) (reverse situation: injury occurred when first insurer on the risk, and such insurer held liable); 100 C.J.S. *Workmen's Compensation* § 373b, at 97–98 ("In connection with the liability of successive insurers, it has been broadly held that for the same disability only one insurer can be charged, and that the date of the first compensable disability controls in fixing and determining the liability between successive insurance carriers.").

We hold that the compensable injury occurred when Lumberman's was on the risk and that Lumberman's is the insurer liable.

We uphold the district court's judgment affirming the agency's decision.

AFFIRMED.